UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                            :

YVONNE BLOUNT,                    :

                           :

                Plaintiff,        :      **MEMORANDUM AND ORDER**

                           :

        - against -          :

                           :      2:03-cv-0023-ENV-ETB

PETER SWIDERSKI, DAVE JANOSEK,    :

HAROLD BUTLER and DOREEN McKENNA,  :

                           :

               Defendants.    :

                           :
-------------------------------------------------------------X

## BACKGROUND

I.      **Introduction**

        Plaintiff Yvonne Blount ("Blount"), a black female, claims that, on January 6, 2000, she was physically assaulted by defendant Peter Swiderski ("Swiderski"), a court officer, at the Nassau County Family Court. She claims, further, that her race was the motivation for Swiderski's assault. Blount brings suit against him here, pursuant to 42 U.S.C. § 1983, alleging excessive force and unequal treatment based on race, in violation of the Fourth and Fourteenth Amendments. She also alleges that, because of her race, defendants Harold Butler ("Butler"), the Family Court's chief clerk, and Dave Janosek ("Janosek"), a supervising court officer, failed to fully and properly investigate the incident. Blount's § 1983 claims against them allege unequal treatment based on race, in violation of the Fourteenth Amendment. Lastly, Blount alleges, pursuant to 42 U.S.C. §§ 1983 and 1985, that her former supervisor, defendant Doreen McKenna ("McKenna"), and Swiderski entered into a conspiracy to give false testimony at her workers' compensation hearing, again due to her race, thus depriving her of due process and

equal protection.

Defendants Butler and Janosek have moved for summary judgment, pursuant to Fed. R. Civ. P. 56, and defendant McKenna has also moved for summary judgment on Blount's conspiracy claims.  For the reasons that follow, both motions are granted and all claims against these defendants are dismissed.

II.     **The January 6, 2000 Incident**

In January 2000, Blount was employed by the Nassau County Department of Social Services as a Child Protective Services ("CPS") caseworker, a position that sometimes required her to testify in Family Court proceedings.  (Deposition of Yvonne Blount ("Blount Dep.") at 25-26.)  On January 6, 2000, she was scheduled to testify at a child custody proceeding to be held before Judge Lawrence J. Brennan of the Nassau County Family Court.  (<u>Id.</u> at 31-32.)  At the courthouse that day, she was accompanied by CPS caseworker Sylvia Dymant ("Dymant") and Deputy County Attorney Jack Phelan ("Phelan").  (<u>Id.</u> at 42.)  While they waited for their case to be called, Blount, Dymant, and Phelan stood in a private hallway near a private backdoor entrance to the courtroom.  (<u>Id.</u> at 122-23.)  Although CPS caseworkers were required to wear identification, neither Blount nor Dymant was wearing identification while waiting in the private hallway.  (Doreen McKenna, Workers' Compensation Board Testimony, Mar. 8, 2001 ("McKenna WCB"), at 10; Blount Dep. at 44.)  Eventually, Court Officer Swiderski, who had previously been inside the courtroom, came to the door and asked that those working on Blount's case enter the courtroom.  (Blount Dep. at 124.)  Blount has testified that Swiderski came to the point where the door meets the courtroom.  (<u>Id.</u>)  No party disputes that the door in question

2

opens inward, that is, into the courtroom.  (Id.; Deposition of Peter Swiderski ("Swiderski Dep.") at 88.)  At this point, accounts diverge.

A.    Blount's April 29, 2004 Deposition

Blount was deposed by defense counsel on April 29, 2004, at which time she gave her account of what happened when she was about to enter Judge Brennan's courtroom.  She testified that Phelan was the first to enter the courtroom with Dymant following.  (Blount Dep. at 42.)  Dymant was walking backwards because she was speaking with Blount, who was following behind.  (Id. at 43.)  Dymant continued walking backwards and had barely cleared the length of the courtroom's open door when, suddenly and without reason, Swiderski stopped Blount by throwing her into the door, spinning her around, and holding her right arm behind her back.  (Id. at 46-47, 125.)  Swiderski then let go of Blount and "words ensued."  (Id. at 48.)  While this encounter was unfolding, Dymant, who had been walking backwards just ahead of Blount, said something that Blount could not remember.  (Id. at 48, 52, 54.)  Blount was also unable to remember the substance of what Swiderski had said after releasing her from the arm-lock.  (Id. at 53.)  Blount did specifically recall, however, that Swiderski had turned so that his gun was visible and pointed his finger in her face, exclaiming "somebody needs to teach you courtroom conduct.  Someone needs to teach you courtesy."  (Id.)  Blount's next memory was of Judge Brennan banging his gavel and telling her not to take Swiderski's actions personally.  (Id. at 57.)  Despite these words, Blount remained distraught.  She left the courtroom crying and unable to testify.  (Id. at 58.)

B.    Blount's March 31, 2004 Affidavit

Before her deposition, Blount had submitted an affidavit, dated March 31, 2004, relating the events of January 6, 2000.  Blount made clear in the affidavit that "[a]t the point where defendant Swiderski assaulted me, we had not actually entered the courtroom, but were still in the entrance to the courtroom."  (Aff. of Yvonne Blount, dated Mar. 31, 2004 ("Blount Aff."), ¶ 10.)  The affidavit adds that Blount and Swiderski were in a position where they would not have been visible to anyone in the courtroom.  (Id. ¶ 11.)  The encounter came to an end when Judge Brennan banged his gavel and called for order, at which point, Blount demanded an explanation of why she had been stopped when her white colleagues, Phelan and Dymant, had been permitted to freely enter the courtroom.  (Id. ¶ 12.)

C.    Blount's March 16, 2000 Letter

Just over three months after the incident, on March 16, 2000, Blount wrote a letter, which gives yet another account of the events of January 6, 2000.  According to her letter, Blount was assaulted by Swiderski as she "walked into the courtroom."  (Letter of Yvonne Blount, dated Mar. 16, 2000, at 1.)  Just prior to the incident, Blount wrote, she had been talking with Dymant, whom she was walking "directly" behind.  (Id.)  The alleged physical altercation, as told in this version, was limited to Swiderski roughly grabbing Blount's right arm, at which point she pulled away.  (Id.)  Swiderski yelled at Blount and the two had "many exchanges" of words before being cut off by Judge Brennan, who told Blount not to take the incident personally because the officer was only trying to protect the court.  (Id.)  Blount then yelled that Swiderski's actions had nothing to do with safety because she, a person of color, was the only entrant who had been

stopped. (Id. at 2.) The officer then yelled again that Blount needed to adhere to the courtroom code of conduct. (Id.) In response, Judge Brennan allegedly cleared the courtroom. (Id.)

D.      Swiderski's May 17, 2001 Testimony Before the Workers' Compensation Board

Blount never returned to work, claiming an allegedly severe psychological condition precipitated by the incident. She sought workers' compensation benefits instead. At a hearing before the workers' compensation board, Swiderski testified to an account of events vastly different from any of those put forth by Blount. He testified that Jack Phelan, Sylvia Dymant, and a law guardian were already in the courtroom conferencing with Judge Brennan when Blount entered. (Peter Swiderski, Workers' Compensation Board Testimony, May 17, 2001 ("Swiderski WCB"), at 4, 9-10.) Swiderski explained that the private backdoor entrance through which Blount entered was located in the back of the courtroom next to benches that faced Judge Brennan's bench. (Id. at 12.) The conference was, by Swiderski's account, a closed one that was not open to the general public. (Id. at 14.) In response to seeing Blount enter the courtroom, Swiderski asked her to identify herself, but she ignored the request and walked to a seat in the courtroom's rear. (Id.) Swiderski followed Blount and repeated his request, but Blount again refused, stating that she did not have to explain who she was. (Id.) In response to further requests for identification, Blount yelled that Swiderski had not asked the white individuals, Phelan and Dymant, to do the same. (Id.) At this point, Judge Brennan inquired of Swiderski, who explained that Blount would not identify herself. (Id. at 8.) Another individual in the courtroom – either Phelan or Dymant – interjected that Blount was a caseworker assigned to the case. (Id.) Blount then complained to Judge Brennan that she was being treated unfairly

because Swiderski had not also asked her white colleagues to identify themselves when they entered the courtroom.  (Id.)  In response, Judge Brennan asked Blount to wait outside the courtroom until the Court was ready to hear her testimony.  (Id. at 9.)  Blount left the courtroom as instructed, calling Swiderski a cracker on her way out.  (Id.)  Swiderski denied ever having physical contact with Blount.  (Id. at 6.)

E.     Swiderski's May 5, 2004 Deposition

Swiderski was deposed by Blount's counsel on May 5, 2004.  He testified that prior to January 6, 2000, he had never seen Blount.  (Swiderski Dep. at 81.)  He was, however, familiar with Phelan and Dymant because of their prior courtroom appearances.  (Swiderski Dep. at 86-87.)  Swiderski denied having any physical contact with Blount.  (Swiderski Dep. at 81.)[1]

III.    **The Investigation**

A.     Blount's Complaint

After leaving Judge Brennan's courtroom on January 6, 2000, Blount asked several individuals where she could file a complaint and was directed to the Office of the Nassau County Family Court Chief Clerk, defendant Harold Butler.  (Blount Dep. at 58)  As chief clerk, Butler supervised the court's non-judicial staff.  (Deposition of Harold Butler ("Butler Dep.") at 10-11.)  When she arrived at his office, Blount explained to Butler that she had been involved in an incident with a court officer and wanted to file a complaint of racial discrimination and excessive force.  (Blount Dep. at 59-62.)  Butler, who is also black, responded by providing a complaint form and informing Blount of her right to file a complaint.  (Id. at 62.)  While Blount was

_____

[1]  A fuller discussion of Swiderski's deposition testimony is not possible because the parties have produced only segments of his deposition as exhibits.

writing her complaint, Butler left the office and shortly thereafter returned with defendant Dave Janosek, who at the time was employed as a court officer lieutenant by the New York State Office of Court Administration ("OCA"). (Id. at 64; Janosek Dep. at 8.) At the Nassau County Family Court, Janosek was responsible for overall building security and supervision of court officers. (Janosek Dep. at 9.) Blount has testified that when Janosek entered the office, he sat opposite her, laid back, put his feet up on the table with arms behind his head. (Blount Dep. at 64-65.) At this point, Blount was crying and she explained to Butler and Janosek that she had earlier been attempting to enter a courtroom when a court officer had blocked her passage, put her up against a wall, and twisted her arm behind her back. (Janosek Dep. at 43-44.) Blount stated her belief that she had been singled out on the basis of race because her white co-workers were allowed to enter the courtroom without question. (Blount Aff. ¶ 17.) Blount told the investigating officers that potential eyewitnesses to the incident were Judge Brennan, Jack Phelan, and Cynthia Dymant. (Blount Dep. at 68.) She was unsure whether any other individuals might have witnessed the incident. (Id.) When Blount finished writing out a complaint on the form provided by Butler, she requested a copy. (Id. at 66.) However, Janosek responded that he would not sign the complaint form until he had investigated the complaint. (Id.) Butler agreed, telling Blount that she would receive a copy "when everything is completed." (Id.) Blount then left the office. (Id.)

B.      Butler and Janosek Investigate

Upon Blount's departure from the clerk's office, Butler and Janosek immediately walked to Judge Brennan's courtroom. (Janosek Dep. at 107.) There, they questioned Judge Brennan,

the court clerk, court reporter, and others who were present in the courtroom.  (Butler Dep. at 53, 117-18; Janosek Dep. at 108.)  Only later would Butler and Janosek locate and question Jack Phelan.  (Janosek Dep. at 108.)  Cynthia Dymant, the closest eyewitness to the incident, was never questioned as part of the investigation.  (Id.)  Critically, none of those interviewed corroborated Blount's account of events.

i.     *Judge Brennan*

In response to questioning, Judge Brennan told Butler and Janosek that he had observed an incident in his courtroom.  (Butler Dep. at 59.)  Judge Brennan had seen Swiderski bringing the parties into the courtroom when there was a commotion at the door, which caused him to look up and inquire.  (Id.; Janosek Dep. at 74.)  Judge Brennan concluded, based on his observations, that Swiderski had not acted inappropriately.  (Butler Dep. at 60.)  In response to questioning, Judge Brennan indicated that there were no signs of "abuse."  (Id.)  Judge Brennan further stated that the incident had nothing to do with Blount's race.  (Janosek Dep. at 110.)  Butler met a second time with Judge Brennan and, at this second meeting, Judge Brennan confirmed his initial account.  (Butler Dep. at 61-63.)

ii.    *James Carpenter (Court Clerk)*

In response to questioning, James Carpenter, the court clerk, told Butler and Janosek that he had heard a commotion or raised voices at the courtroom door when Blount was about to enter.  (Id. at 55; Janosek Dep. at 67.)  Carpenter observed that Blount was insisting upon entering, but Swiderski "would not let her in until she identified herself, and that was it."  (Butler Dep. at 55.)  At the time of the incident, he remembered Blount being just inside the courtroom.

(Id. at 55.)  He observed no physical contact.  (Janosek Dep. at 68.)  Butler met a second time with Carpenter.  At this second meeting, Carpenter confirmed his initial account.  (Butler Dep. at 53.)

### iii.  *Deputy County Attorney Jack Phelan*

Butler spoke with Jack Phelan about Blount's complaint; however, at his deposition, Butler could not recall the specifics of this conversation.  (Id. at 63.)  Janosek recalled a conversation with Phelan, during which Phelan stated that from his vantage point in Judge Brennan's courtroom – about 15 feet away and with his back to the incident's location – he did not observe a physical confrontation between Blount and Swiderski.  (Janosek Dep. at 81-82.)  Phelan also testified at Blount's workers' compensation hearing.[2]  At that hearing, Phelan recalled that he had entered the courtroom on January 6, 2000 and was already speaking to Judge Brennan for a few seconds when he became aware of a situation in the back of the courtroom.  (Jack Phelan, Workers' Compensation Board Testimony, Mar. 7, 2001, at 4).  Although he was just five feet from the spot of the incident, Phelan heard no screaming or yelling and did not observe a physical altercation.  (Id. at 4, 6.)  Phelan further testified that Judge Brennan never banged his gavel or yelled "order in the court."  (Id. at 6.)  All Phelan could remember was turning back to view the scene at some point after the incident when he observed Blount sitting on one of the courtroom's rear benches looking upset.  (Id. at 5.)

---

[2]  While Phelan's later testimony before the workers' compensation board does not directly bear on the investigative choices that Butler and Janosek were forced to make, the testimony is nonetheless relevant to the extent that it: (i) reflects what Phelan likely told Butler and Janosek at an earlier point; (ii) corroborates other accounts of the events that Butler and Janosek relied upon; and (iii) dispels the notion that the investigators selectively relied upon information that suited their allegedly racist agenda.

iv.     *The Court Reporter*

Butler interviewed the court reporter who was present in Judge Brennan's courtroom at the time of the incident.  (Butler Dep. at 56-57.)  At this deposition, Butler recalled the court reporter stating, in substance, that from his vantage point in the courtroom, he could observe Blount and Swiderski, but that he "didn't see anything happen."  (Id.)  Janosek also spoke with the court reporter, who recalled the incident ensuing when Blount entered the courtroom and refused to produce her identification in response to a request by Swiderski.  (Janosek Dep. at 76-77.)

v.     *Cynthia Dymant*

Though Cynthia Dymant had been called to the attention of Butler and Janosek as an eyewitness to the incident, neither interviewed her.  (Butler Dep. at 63; Janosek Dep. at 80.)  Dymant would, however, reveal her version of events in testimony before the workers' compensation board.  She testified that on January 6, 2000, she had entered into Judge Brennan's courtroom, walking directly behind Jack Phelan.  (Cynthia Dymant, Workers' Compensation Board Testimony, May 17, 2001, at 19.)  Dymant never witnessed a commotion or Swiderski touching Blount.  (Id. at 18-19.)  In fact, her first recollection of anything unusual occurred only after she had reached the front of the courtroom, when she turned her head and observed Blount telling Judge Brennan that she was very insulted because Swiderski requested identification from her and not from anyone else.  (Id. at 21.)  Beyond that exchange, Dymant could not recall any extraordinary occurrences.  (Id. at 22.)  She did not recall Blount leaving the courtroom until the proceeding had concluded.  (Id.)

vi.     *Peter Swiderski*

After the incident, but still on the day of January 6, 2000, Swiderski was questioned in Butler's office by Butler and Janosek.  (Butler Dep. at 93; Swiderski Dep. at 62-69, 72.) Swiderski denied ever having physical contact with Blount.  (Swiderski Dep. at 96.)  Swiderski explained that he had stopped Blount while allowing the others to enter the courtroom because those other individuals were county personnel with whom he was familiar.  (Aff. of Harold Butler, dated Jul. 2, 2003 ("Butler Aff."), ¶ 6.)  Swiderski was unaware that Blount had any relationship to the ongoing proceeding and had thus requested, to no avail, that she identify herself.  (Aff. of Dave Janosek, dated Jul. 1, 2003 ("Janosek Aff."), ¶ 8.)

C.     Butler and Janosek Conclude the Investigation

After interviewing Swiderski and eyewitnesses to the incident, Butler and Janosek spoke for a few minutes and agreed that Blount's complaint was unfounded.  (Janosek Dep. at 117; Butler Aff. ¶ 7.)  None of the witnesses had corroborated Blount's account and there was no indication of any prior incidents of racial discrimination or excessive force involving Swiderski. (Janosek Aff. ¶ 9.)  Butler and Janosek concluded that there had been no physical altercation and that any action taken by Swiderski was in line with his duties and not racially motivated. (Janosek Dep. at 117-18.)

It is undisputed that Butler and Janosek failed to thoroughly document their investigation. Janosek testified that the investigation was a cursory and preliminary one, but one which signaled no need for a fuller and more extensive investigation.  (Id. at 88.)  When interviewing Swiderski, Butler and Janosek took no written notes or statement.  (Swiderski Dep. at 70.)  They

referred to no documents in making their final decision. (Janosek Dep. at 116.) Janosek has testified that his immediate superior, Major Martin D'Amico, told him that no written report needed to be filed, though D'Amico was unable to recall this conversation at his deposition. (Id. at 82-85; Deposition of Major Martin D'Amico ("D'Amico Dep.") at 40-41.) Butler did maintain a file containing Blount's complaint and some notes from his investigation, but the file was discarded when he retired in May 2002, before commencement of this action. (Butler Dep. at 65.)

After filing her complaint with Butler, Blount made two follow-up phone calls. (Blount Dep. at 68-70.) Approximately one week after the incident, Blount called the chief clerk's office and asked for a copy of her written complaint. (Id. at 69.) A secretary told Blount that she would look into the matter and get back to her. (Id.) Having received no response about a week later, Blount once again called the chief clerk's office and was told by the same secretary that "there's no paperwork on the case." (Id. at 69-70.) The secretary told Blount that someone would get back to her, but no one ever did. (Id. at 70; Blount Aff. ¶ 30.) Blount would have no further contact with the chief clerk's office. (Blount Aff. ¶ 30.)

D.     General Complaint Procedure

i.     *New York Office of Court Administration Complaint Procedure*

The New York State Office of Court Administration allows employees and members of the public to file complaints of discriminatory treatment to the Managing Inspector General for Bias Matters ("Inspector General") or locally to the chief clerk of the court or administrative

judge of the county.  (Deposition of Kayann Porter Campbell ("Campbell Dep.") at 82.)[3]  The

New York state court system recognizes, as does this Court, that "[i]t is important that

individuals know that they have options available to help address any matter believed to involve

illegal discrimination."  New York State Unified Court System, Discrimination Claim Policy &

Procedure, at 4 (2002).  If a discrimination complaint is handled locally by the chief clerk, as it

was in Blount's case, there is no requirement that the Inspector General be informed, even where

the claim is determined to be unsubstantiated or unfounded.  (Campbell Dep. at 86.)  The

Inspector General operates independently and not as a "check and balance" to oversee local

investigations.  (Id. at 63-64.)  As such, the Inspector General does not require that local level

investigators maintain any type of files or documentation on complaints.  (Id. at 62.)

     ii.     *Nassau County Family Court Complaint Practice*

At his deposition, Janosek testified that he could not recall whether he had ever been

trained in how to handle public complaints against court officers.  (Janosek Dep. at 27.)  He

further could not recall ever being informed of policies or procedures to follow in such instances.

(Id.)  In such cases, he would generally speak to all of those involved and then make a

recommendation to his supervisor.  (Id. at 28.)

At his deposition, Butler testified that he had attended several seminars on handling bias

---

[3]  Several statements contained within Blount's counterstatement of material facts, submitted pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, are unsupported by the cited portions of the record.  Specifically, in paragraph 31, Blount references certain notices and forms that New York courts are allegedly required to post and make publicly available.  Though Blount may be correct, the cited portions of the record, from the deposition of Kayann Porter Campbell, provide no basis of support as Campbell clearly stated that she lacked sufficient knowledge to answer.  Thus, in resolving the pending motions, the Court disregards the statements in paragraph 31, which are unsupported by the cited authority.

complaints. (Butler Dep. at 24.) However, he could not recall ever being instructed to follow any specific procedures or guidelines in handling complaints. (Id. at 22-24.) Butler generally would not conduct an investigation of a court officer himself. (Id. at 13-14.) His ordinary practice was to direct a complainant to file a written (and not oral) complaint with the court officer's supervisor, the major, or deputy clerk. (Id.; Butler Aff. ¶ 4) Though Butler encouraged written complaints, he could not recall ever having seen the complaint form that OCA had disseminated to courthouses. (Butler Dep. at 72-73.) He could, however, recall certain OCA notices about bias matters that were posted and publicly visible in the courthouse. (Id. at 22.) Butler added that he would usually only be informed of an investigation's result, if necessary, at its conclusion. (Id. at 19.)

At his deposition, Major D'Amico testified that in the case of an altercation between a court officer and member of the public, he would expect the officer to submit an unusual occurrence report, though he also noted that there were no "hard-and-fast rules" on when these reports were to be submitted. (D'Amico Dep. at 33-35.) Such reports were forwarded to OCA. (Id. at 36.)

iii.     *Janosek's Handling of Other Investigations*

Aside from Blount's complaint, Janosek has investigated two other incidents where a member of the public had brought a formal complaint against a court officer. (Janosek Dep. at 12-13.) The first was in the mid-1980s and involved a black female who brought a discrimination complaint against a white officer. (Id. at 12, 20.) She brought her complaint to the chief clerk, who then summoned Janosek and spoke to him about how to conduct the

investigation.  (Id. at 13, 15-16.)  During that investigation, Janosek and the chief clerk had

many discussions about the case.  (Id. at 15.)  Janosek interviewed those involved and concluded

that the officer had not acted wrongly and that no action should be taken.  (Id. at 17.)  During his

investigation, Janosek took notes and wrote a report, which was forwarded to the Inspector

General. (Id. at 14.)  In response to receiving a report of discrimination, the Inspector General

dispatched an investigator who interviewed witnesses and reviewed the notes and statements

taken by Janosek.  (Id. at 17.)  Janosek never communicated the adverse finding to the

complainant until she appeared at the courthouse several weeks later with an attorney, at which

point, he and the chief clerk explained the finding.  (Id. at 18-20.)

Janosek investigated a second incident involving a court officer sometime around

October 2003.  (Id. at 21.)  In that instance, the complainant, a white female, came directly to

Janosek's office and asked to file a formal complaint because a female court officer had

mistreated her by acting condescendingly.  (Id. at 21-22.)  Shortly after the complaint was

lodged, an attorney approached Janosek and related his impressions of the incident.  (Id. at 24.)

The attorney's account contradicted the complainant's, and the attorney explained that he felt

compelled to approach Janosek because he had overheard the complainant say she was going to

report the court officer.  (Id.)  Janosek further investigated the claim by speaking with others

who had been in the vicinity of the alleged incident.  (Id. at 22-23.)  No one could corroborate

the complainant's story.  (Id.)  Janosek spoke with the court officer in question but did not take a

written statement.  (Id. at 24.)  During his investigation, Janosek did not communicate with the

chief clerk's office and, at the conclusion of his investigation, he forwarded a report to his

supervisor, Major D'Amico. (Id.) Janosek never forwarded a copy of his report to the Inspector General's Office. (Id. at 25.) He also never communicated his finding to the complainant until she returned to the courthouse several weeks later, at which point, he told her that he had recommended no action be taken because her complaint was unfounded. (Id. at 26.)

## IV.    **Conspiracy Claim**

A.    McKenna's Testimony to the Workers' Compensation Board

At Blount's workers' compensation hearing, her former supervisor at CPS, defendant Doreen McKenna, appeared and testified. Though McKenna made clear that she had no first-hand knowledge of the incident in Judge Brennan's courtroom on January 6, 2000, she recounted what she had been told by the parties involved. (McKenna WCB at 11.) Specifically, McKenna testified that on the day of the incident, Blount called her and said

> that she was going to Family Court to testify on a case that she had on my child protective service unit and at the time when she arrived there the Court Officer put his arm around her and prevented her from going into the Courtroom . . . . She said she was upset and felt he did this to her because she was black.

(McKenna WCB at 4.) McKenna asked Blount if she was physically hurt and Blount responded that she had no physical injury, but badly hurt feelings. (Id. at 4, 14.) McKenna denied ever using an obscenity in the phone call when describing Swiderski, as Blount had claimed at her deposition. (Id. at 14; Blount Dep. at 72.)[4]

McKenna testified that she did not personally know Swiderski prior to this incident.

---

[4] At her deposition, Blount never specifically testified to what she told McKenna regarding the incident in the courthouse. Instead, Blount generally asserted that her statements to McKenna regarding the incident were consistent with the testimony she had earlier put forth at her deposition. (Blount Dep. at 96, 112-13.)

(Deposition of Doreen McKenna at 17.)  However, about a week before she testified at the

workers' compensation hearing, McKenna was approached – apparently at the Nassau County

Family Court – by Swiderski, who asked her about the case and, according to McKenna, told his

side of the story.  (McKenna WCB at 11.)  Swiderski told McKenna that he had stopped Blount

on January 6, 2000, because she was not wearing identification and he thought she was entering

the courtroom as part of her personal Family Court matter, which was ongoing at the time.[5]  (Id.

at 8, 10, 15.)

B.     McKenna's Alleged Racial Animus

Blount also claimed at her deposition that, when responding to childcare calls, McKenna

discriminated against black families.  (Blount Dep. at 114.)  More specifically, Blount testified

that "when we went to black houses, it seemed like they always wanted to do removals.  'You

got your removal forms?'  But then when you went to white clients' houses, it's 'Let's put some

services in.'" (Id. at 114.)  Blount vaguely noted one instance in which McKenna allegedly

disagreed with her removal recommendation involving a white mother who would eventually

murder her husband.  (Id. at 115.)  Blount also noted another disagreement regarding West

Indian families whose teenage sons and daughters would sleep in bed together.  (Id. at 116.)

Other than these alleged policy disagreements, Blount offers no concrete evidence of McKenna's

alleged racial animus.

## PROCEDURAL HISTORY

The claims presented in this action arise out of three events: (i) Swiderski's alleged

---

[5]  Blount does not contest that she had a personal Family Court matter ongoing at the time.

discriminatory assault of Blount on January 6, 2000; (ii) Butler and Janosek's alleged discriminatory failure to fully and properly investigate that incident; and (iii) the alleged conspiracy between Swiderski and McKenna to give false testimony regarding the underlying incident at Blount's workers' compensation hearing. What is now before the Court is the precipitate of nearly four years of extensive motion practice, during which numerous claims and parties were either added or removed.

Blount initiated this action on January 3, 2003, alleging various constitutional violations by Nassau County, OCA, Swiderski, Janosek, Butler, and McKenna. On January 23, 2003, Blount amended her complaint for the first time. On April 4, 2003, McKenna and Nassau County moved to dismiss the amended complaint and, on June 23, 2003, defendants OCA, Janosek, Butler, and Swiderski also moved to dismiss. While these motions were pending, Blount sought leave to file a second amended complaint in order to add another cause of action against defendant OCA. On October 29, 2003, District Judge Joanna Seybert referred all of the then-pending motions to Magistrate Judge E. Thomas Boyle.

On January 9, 2004, Magistrate Judge Boyle issued a Report and Recommendation recommending that the Court: (i) deny Blount's motion for leave to amend because the proposed additional claims against OCA would be barred by the Eleventh Amendment; (ii) dismiss claims against Nassau County with prejudice; and (iii) dismiss claims against McKenna without prejudice. On February 26, 2004, Judge Seybert adopted the Report and Recommendation in its entirety.

On March 26, 2004, Blount filed a second amended complaint, which: (i) added new

allegations pertaining to the conspiracy between McKenna and Swiderski to give false testimony; and (ii) added the New York Unified Court System as a defendant.

On April 20, 2004, defendant McKenna moved to dismiss on the ground of absolute witness immunity. On April 29, 2004, the New York Unified Court System moved to dismiss on sovereign immunity grounds, and Swiderski moved to dismiss the claims of giving false testimony and conspiring to give false testimony at Blount's workers' compensation hearing. On May 21, 2004, defendants Butler and Janosek moved to dismiss on qualified immunity grounds. These motions were referred to Magistrate Judge Boyle.

On January 26, 2005, Magistrate Judge Boyle issued a Report and Recommendation recommending that the Court: (i) grant defendant McKenna's motion to dismiss the claim of offering perjured testimony; (ii) deny defendants McKenna's and Swiderski's motions to dismiss the claims based on their alleged conspiracy to provide false testimony; (iii) deny defendants Butler and Janosek's motion to dismiss based on qualified immunity; and (iv) deny Swiderski's motion to dismiss the complaint in its entirety.

On March 15, 2005, Judge Seybert adopted in part and modified in part the Report and Recommendation of Magistrate Judge Boyle. Specifically, Judge Seybert adopted Magistrate Judge Boyle's conclusions but addressed two additional claims and: (i) granted the New York Unified Court System's motion to dismiss because no cause of action had been asserted against it; and (ii) granted defendant Swiderski's motion to dismiss the claim of offering perjured testimony. On April 13, 2005, Blount filed her third amended complaint.

On July 21, 2006, defendant McKenna moved for summary judgment with regard to

Blount's remaining claims against her, brought pursuant to 42 U.S.C. §§ 1983 and 1985, which allege a conspiracy between McKenna and Swiderski to deprive Blount of equal protection and due process through the offering of false testimony. On August 14, 2006, defendants Butler and Janosek moved for summary judgment, asserting a qualified immunity defense to Blount's equal protection claim.

**STANDARD FOR SUMMARY JUDGMENT**

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding, based on the pleadings, depositions, interrogatory answers, admissions, and affidavits that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). In determining whether the moving party has met this burden, a court must construe all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original); Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 90 (2d Cir. 2002). Material facts are

those, which given the substantive law, might affect the suit's outcome.  <u>Anderson</u>, 477 U.S. at 248.

If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); <u>Davis v. New York</u>, 316 F.3d 93, 100 (2d Cir. 2002).  In so doing, the nonmoving party may not rely on conclusory allegations or speculation.  <u>Golden Pac. Bancorp v. FDIC</u>, 375 F.3d 196, 200 (2d Cir. 2004) (citing <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir.1998)); Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").  Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005) (quoting <u>Matsushita</u>, 475 U.S. at 586).  Nonetheless, the nonmoving party need not make a compelling showing; it need merely show that reasonable minds could differ as to the import of the proffered evidence.  <u>R.B. Ventures, Ltd. v. Shane</u>, 112 F.3d 54, 59 (2d Cir. 1997).

## DISCUSSION

I.     **Failure to Investigate Claim**

The third amended complaint alleges that Butler and Janosek "failed or refused to act to fully and objectively investigate Blount's claim of racial harassment and excessive force against Swiderski; selectively conducted their investigation of plaintiff's complaint of racial harassment

and excessive force against defendant Swiderski; and failed to follow policies and procedures with respect thereto, on account of plaintiff's race, or in order to prohibit or punish her exercise of her constitutional rights or based on bad faith intent." Third Amended Complaint ¶ 49. The complaint adds that those acts have denied Blount "equal protection of the law, on account of her race and/or on account of her exercising her constitutional right to seek redress." Third Amended Complaint ¶¶ 54-55. In seeking summary judgment, Butler and Janosek argue that Blount's claim is barred by the doctrine qualified immunity.

Qualified immunity applies to suits against state officials for acts in the course of their duties that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Cartier v. Lussier, 955 F.2d 841, 843 (2d Cir. 1992) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It applies when either: (i) the state official did not violate a clearly established right; or (ii) it was objectively reasonable for the state official to believe that he was not violating a clearly established right. Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003). The threshold issue, then, is whether the right asserted is so clear in a "particularized sense" that a reasonable state official would have known that his actions violated the right. Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991) (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Even given the violation of a right, qualified immunity may still apply if the defendant has made an objectively reasonable mistake or if the plaintiff asserts a right so general that its application is unclear in the given context. Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004); Kaminsky, 929 F.2d at 925. "The objective reasonableness test is met–and the

defendant is entitled to immunity–if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

In assessing a qualified immunity defense on summary judgment, courts apply a three-step sequential inquiry, viewing the facts in a light most favorable to the plaintiff, and asking: (i) whether the facts show the violation of a federal right; (ii) if so, whether the federal right was clearly established at the time of the violation; and (iii) if so, whether the plaintiff has demonstrated that the defendants' actions were not objectively reasonable. See Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211-12 (2d Cir. 2003) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). When a motive-based constitutional violation is alleged, this Court heeds the instruction of the United States Supreme Court:

> [I]f the defendant-official has made a properly supported motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive.

Crawford-El v. Britton, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); Duamutef v. Hollins, 297 F.3d 108, 113 (2d Cir. 2002) (plaintiff must offer a "particularized proffer of evidence of unconstitutional motive") (citation omitted).

A plaintiff bringing an equal protection claim based on selective treatment must show that: "(1) he was treated differently from other similarly-situated individuals; and (2) the differential treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a

person.'" Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 110 (2d Cir. 2006); Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005); LeClair v. Saunders, 627 F.2d 606, 609-610 (2d Cir. 1980).

In moving for summary judgment, defendants Butler and Janosek first assert that Blount's claim is not based upon a cognizable federal right. This contention is an empty one, however, as it ignores the plain language of Blount's allegations and the Court's earlier orders. Were Blount merely claiming that the defendants failed to investigate her complaint, dismissal would be appropriate. An individual is not constitutionally entitled to an investigation in response to an assault claim. See Santossio v. City of Bridgeport, No. 3:01CV1460 (RNC), 2004 WL 2381559, at *4 (D. Conn. Sep. 28, 2004); Daniels v. City of Binghamton, No. 3:95-CV-688, 1998 WL 357336, at *5 (N.D.N.Y. Jun. 29, 1998). It does not matter if the failure to investigate violates some state policy. A state law violation can serve neither as the basis of a § 1983 claim nor as a clearly established right sufficient to defeat a defendant's assertion of qualified immunity. Robison v. Via, 821 F.2d 913, 922 (2d Cir. 1987) (citing Davis v. Scherer, 468 U.S. 183, 194-96, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). However, Blount claims more than a mere failure to investigate. She alleges that the defendants violated her equal protection rights by purposely failing, because of constitutionally improper motives, to investigate her complaint as they would investigate other complaints. Thus, Blount's claim is grounded in equal protection and not merely in the defendants' failure to follow state law procedure. Defendants Butler and Janosek's contentions on this ground are wasteful because the Court has previously resolved the issue. By rejecting similar contentions earlier in this litigation, Magistrate Judge Boyle put the defendants on notice that "while there is no federal constitutional right to an adequate

investigation *per se*, courts have recognized section 1983 claims that involve the selective denial of equal protection based on the discriminatory failure of public officials to a [sic] conduct a proper investigation." Blount v. Swiderski, No. 03-cv-0023, Report and Recommendation, at 15 (E.D.N.Y. Jan. 26, 2005) (citing Daniels, 1998 WL 357336, at *5); DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 n.3, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."). This Court agrees and sees no reason to upset Magistrate Judge Boyle's prior determination, which was adopted by District Judge Joanna Seybert. Nonetheless, the Court is also aware that on summary judgment, mere allegations are insufficient. Behrens v. Pelletier, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). At this stage, Blount needs to adduce proof sufficient to create a genuine issue of material fact on her selective treatment claim.

While this Court is cautious in granting summary judgment on motive-based discrimination claims, it will not shirk its duty to do so when a plaintiff's proof is wholly inadequate. This is such a case. While it is clear that defendants Butler and Janosek concluded that Blount's complaint was baseless, there is no evidence whatsoever to suggest that their investigatory process or conclusions were influenced in any way by bias. A reasonable jury could not conclude otherwise.

All in all, the handling of Blount's complaint by Butler and Janosek was not so unusual or remarkable as to raise even the slightest inference of improper motive. These defendants were approached on January 6, 2000 by Blount, who complained that she had been assaulted while

entering Judge Brennan's courtroom. Blount gave the names of possible eyewitnesses who were in the courtroom. There is no indication in the record that Blount ever told them, as she now alleges, that the assault occurred in a part of the courtroom's entranceway that was unobservable to those inside the courtroom. Butler and Janosek responded *immediately* to the complaint by walking to Judge Brennan's courtroom so that they could question those who might have witnessed the alleged assault.

The two investigators interviewed individuals who were in the courtroom at the time of the alleged incident: Judge Brennan, Deputy County Attorney Jack Phelan, the court reporter, court clerk, and other unnamed individuals. None of these individuals could corroborate Blount's account, and several gave flatly contradictory accounts. Judge Brennan told the investigators that he observed an incident, but that there were no signs of abuse or discriminatory behavior. The court clerk explained that he had seen a disagreement occur after the court officer stopped Blount, who was entering the courtroom. He, too, observed no physical confrontation. The court reporter similarly reported that he had a clear view of the incident, which he claimed had ensued when Blount entered the courtroom and refused to produce identification. Lastly, Phelan, who had walked into the courtroom ahead of Blount, stated he had never seen or heard the alleged altercation. Butler and Janosek also spoke with others in the courtroom who were unable to corroborate Blount's account. In sum, then, at least four questioned witnesses could not support Blount's claims. Their statements instead suggested that Blount had been stopped after failing to produce identification. Butler and Janosek failed to question Cynthia Dymant, who was present in the courtroom at the time of the incident, but such a failure was hardly

unreasonable given that at least four other witnesses had not corroborated Blount's allegations of a physical confrontation. In any event, Dymant would eventually testify, at Blount's workers' compensation hearing, that she had not observed an incident and – delivering even more damage to Blount's account – had heard Blount state immediately after the incident that she was insulted because the court officer had asked for her identification.

Both Butler and Janosek jointly met with the alleged assailant, Swiderski, who gave an account of events that was consistent with other witness statements. He denied ever having physical contact with Blount, explaining that he had stopped her because she was not wearing identification and was unfamiliar to him. It is uncontested that CPS policy required that caseworkers wear identification at court appearances.

After interviewing those in the courtroom, Butler and Janosek determined that Blount's claim was unfounded and did not warrant further inquiry. They made this decision based upon all of the information before them, which included witness interviews and the lack of any prior allegations of discrimination or abuse against Swiderski. Their decision to discontinue the investigation after finding no corroborating evidence of misbehavior was not so extraordinary or unusual as to give rise to an inference of improper motive that could stave off summary judgment.

Blount seeks to salvage her claim against Butler and Janosek by attempting to show that the defendants have strayed from the OCA procedure for taking complaints. On this point, the Court notes, of course, that the failure to observe state-imposed procedures is here relevant only to the extent that it might raise an inference of improper motive. Substantively, Blount puts forth

little evidence on this score and none of it helpful to her cause. Discovery has not shown any specific procedures by which New York state court personnel were required to investigate complaints against court officers. Butler, the court's chief clerk, had authority to resolve complaints on his own and was not required to inform the Inspector General if he found a claim to be unsubstantiated. About the only procedural failure in the investigation that Blount has arguably shown is Swiderski's failure to file an unusual occurrence report. In short, Blount offers no evidence of a procedural violation that would support an inference of improper motive on the part of either Butler or Janosek, much less evidence sufficient to overcome their summary judgment motion. The contrary evidence of an appropriately conducted investigation is, bluntly, unchallenged by any evidence offered in opposition.

Finally, Blount attempts, on the basis of Janosek's deposition testimony alone, to show that other similar investigations were handled differently, and therefore, support a finding of improper motive. However, Blount's proof is wholly inadequate. The only evidence offered is a few pages of Janosek's deposition testimony, and the facts surrounding these other incidents have been insufficiently developed to bear much evidentiary weight, let alone support an inference of improper motive on the part of Butler and Janosek in the present case. Without more, simply showing that three unrelated incidents were not identically handled by Janosek does not support an inference of improper motive or of anything else. Indeed, to the contrary, the uncontroverted evidence relied upon by Blount shows that Janosek approached the fact-finding necessary to evaluate each of the three complaints in a very similar fashion. Blount apparently rests on the absence of documentation of Janosek's findings in her case to infer a

discriminatory intent in the way Butler and Janosek handled her complaint. But, to be sure, the issue is not whether the investigatory record was devoid of documentation; it is whether, substantively, the investigation of Blount's complaint was handled in a like manner to other similar complaints. Since plaintiff offers utterly no evidence to prove otherwise, the question ultimately presented on motion is whether the record before this Court is devoid of evidence offered by plaintiff showing discriminatory intent. The Court concludes it is.[6]

## II.    **Conspiracy Claim**

The third amended complaint alleges that McKenna and Swiderski "conspired to give false testimony at plaintiff's workers' compensation hearing concerning Swiderski's actions towards plaintiff on January 6, 2000, denying that Swiderski had any physical contact with plaintiff and misstating courtroom procedures." Third Amended Complaint ¶ 46. At Blount's workers' compensation hearing, McKenna testified that she had been approached about a week earlier by Swiderski, who had relayed his account of the events of January 6, 2000. Blount alleges that during this conversation, Swiderski and McKenna hatched a racist scheme to give false but corroborating testimony at her workers' compensation hearing in order to further deny

---

[6]  The Court also rejects Blount's newly raised supervisory liability claim against defendants Butler and Janosek, in which she seeks to impose liability against them based on the alleged underlying assault. The claim was not raised in Blount's third amended complaint and has never been raised during the nearly four years of this litigation. Regardless, Blount has made no showing, either factual or legal, suggesting that the claim has merit. "Section 1983 imposes liability only upon those who actually cause a deprivation of rights . . . ." Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999). The defendant-supervisors' failures in an after-the-fact investigation cannot, standing alone, be said to have caused the underlying deprivation of rights, and thus cannot be a basis of supervisory liability. See Butler v. City of Norman, 992 F.2d 1053, 1056 (10th Cir. 1993); Vukadinovich v. McCarthy, 901 F.2d 1439, 1444 (7th Cir. 1990). Blount argues that she "has identified specific instances and detailed actions by Butler and Janosek establishing that they embarked on a destructive scheme to derail the investigation of plaintiff's complaint." Pl.'s Mem. in Opp. to Summ. J. at 23. Again, Blount makes no effort to link this alleged failure to the assault itself, but regardless, her conclusory assertions are unsupported by the record.

her equal protection and due process rights. Blount brings two separate conspiracy claims against McKenna and Swiderski, one pursuant to 42 U.S.C. § 1983 and another pursuant to 42 U.S.C. § 1985(3). It is worth noting the differences between the two claims.

The elements of a § 1985(3) conspiracy are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993); Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). Further, there must be a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

The elements of a § 1983 conspiracy are: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).

A § 1985(3) conspiracy claim is in one sense broader than a § 1983 conspiracy claim because, unlike the § 1983 claim, it does not require that a defendant be a state actor. Griffin, 403 U.S. at 99. In another sense, however, the conspiracy claim under § 1983 is significantly broader because it allows a plaintiff to assert a deprivation of any right, privilege, or immunity secured by federal law, whereas a claim under § 1985(3) is much more limited – it requires

"racial, or perhaps otherwise class-based, invidiously discriminatory animus." Id.; Blankman v. County of Nassau, 819 F. Supp. 198, 205-06 (E.D.N.Y. 1993).

The object of the conspiracy alleged here under either section of law, nonetheless, is the same – to give false testimony at Blount's workers' compensation hearing. At that hearing, McKenna testified regarding her conversation of the prior week with Swiderski in which he had relayed his account of the courtroom incident. Having no personal knowledge of those events, McKenna had no basis upon which to propound Swiderski's account as her own – and she did not attempt to do so.

Ordinarily, a witness need not fear being dragged into a civil rights litigation of nearly four years' duration for claims stemming from their testimony, as the common law doctrine of absolute immunity shields against such claims. Rolon v. Henneman, 443 F. Supp. 2d 532, 536 (S.D.N.Y. 2006); Storck v. Suffolk County Dep't of Soc. Servs., 62 F. Supp. 2d 927, 945 (E.D.N.Y. 1999) (citing Briscoe v. LaHue, 460 U.S. 325, 334, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)). The immunity applies to all witnesses, whether governmental, expert, or lay persons. Briscoe, 460 U.S. at 335. It applies in judicial proceedings as well as quasi-judicial administrative proceedings like that held when a claimant brings their claim before a workers' compensation board. See Toker v. Pollak, 44 N.Y.2d 211, 222, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978) (citing Lipton v. Friedman, 2 Misc.2d 165, 152 N.Y.S.2d 261 (Sup. Ct. N.Y. County 1956)). The act of testifying, however, does not immunize the witness from all liability.

In this circuit, although witnesses enjoy absolute immunity for their testimony, the immunity does not extend to claims that they entered into an extra-judicial conspiracy to give

false testimony.  <u>Dory v. Ryan</u>, 25 F.3d 81, 84 (2d Cir. 1994);  <u>San Filippo v. U.S. Trust Co.</u>, 737 F.2d 246, 255 (2d Cir. 1984).  It is of little consequence to this Court that every other circuit to address the issue has come to the contrary conclusion.  <u>See</u> <u>Mowbray v. Cameron County</u>, 274 F.3d 269, 277-78 (5th Cir. 2001); <u>Franklin v. Terr</u>, 201 F.3d 1098, 1101-03 (9th Cir. 2000); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1288-89 (11th Cir. 1999); <u>Watterson v. Page</u>, 987 F.2d 1, 9 (1st Cir. 1993); <u>Snelling v. Westhoff</u>, 972 F.2d 199, 200 (8th Cir. 1992); <u>McArdle v. Tronetti</u>, 961 F.2d 1083, 1085-86 (3d Cir. 1992) (Alito, J.); <u>House v. Belford</u>, 956 F.2d 711, 720-21 (7th Cir. 1992); <u>Miller v. Glanz</u>, 948 F.2d 1562, 1569 (10th Cir. 1991); <u>Alioto v. City of Shively</u>, 835 F.2d 1173, 1174 (6th Cir. 1987).  At most, the overwhelming weight of contrary authority emphasizes the need for district courts in this circuit to take seriously the language of the Second Circuit that its holding in <u>San Filippo</u> "did not open the floodgates to § 1983 litigation by plaintiffs now charging conspiracies rather than mere perjury: '[i]nsofar as witnesses may face groundless 'conspiracy' suits, ample protection against costly defense should ordinarily be provided by the possibility of [Fed.R.Civ.P.] 12(b)(6) dismissal or summary judgment.'"  <u>Dory v. Ryan</u>, 999 F.2d 679, 683 (2d Cir. 1993)(quoting <u>San Filippo</u>, 737 F.2d at 255) (alterations in original).

At this point, after numerous amended complaints and extensive motion practice on the issue, it still remains unclear what, precisely, Blount claims is the alleged overt act in furtherance of the conspiracy between Swiderski and McKenna.  In opposing McKenna's motion for summary judgment, Blount describes the overt act as follows:

> [T]he overt act is the false testimony of McKenna, in a way that
> would not undercut Swiderski's testimony with respect to the issue

before the Workers' Compensation Hearing as to whether plaintiff
sustained a serious injury. In all major respects concerning the issues
that were before the Workers' Compensation Hearing as to whether
plaintiff had sustained a serious, work related injury, McKenna
testified based on what Swiderski had told her during their meeting
a week prior to her testimony. Specifically, McKenna testified that
Swiderski told her that he did not put his hands on plaintiff and that
if he had, he would have been in trouble. McKenna also testified that
Swiderski told her that he thought plaintiff was present in the court
on the day in question on a personal case. When McKenna was
further questioned by the worker's compensation judge about why
Swiderski would think plaintiff was there on a personal case, she
responded, showing the influence of Swiderski's conversation with
her, "Maybe it was because Pete – he told me she [plaintiff] testified
on her own family case."

Pl.'s Mem. in Opp. to Summ. J. at 6.

Critically, McKenna openly conceded at the workers' compensation hearing that she had

no personal knowledge of the incident in Judge Brennan's courtroom on January 6, 2000. When

testifying about the incident, McKenna simply restated what she had been told. For example:

> Q: Did you ask Pete if he threw the claimant up or physically
> –
> A: Yes.
> Q: What did he say?
> A: Absolutely not. He would have been in a lot of trouble
> placing his hands on anybody. Any time you touch
> anybody is when the Judge tells him this person is under
> arrest and he would arrest him.
> Q: Did you speak with Pete as to why he stopped the claimant.
> A: He thought she was on her own case.

(McKenna WCB at 8.)

Blount appears to allege that if Swiderski's statements to her were false, then McKenna's

testimony regarding those statements would constitute an actionable overt act in furtherance of

the conspiracy to give false testimony. Alternatively, Blount seeks to characterize McKenna's

testimony as a form of bolstering Swiderski's testimony. However, McKenna made clear at the workers' compensation hearing that she had no personal knowledge of the incident and was merely recounting what she had been told by Swiderski. For instance, when asked why Swiderski may have stopped Blount at the courtroom's door, McKenna may have speculated in sync with his testimony, but she clearly responded, "[i]t could have been a half a dozen of one or the other. I don't know what Pete was thinking at the time." (McKenna WCB at 17.) Since McKenna lacked the personal knowledge to vouch for the truth of Swiderski's underlying statements, the rationale underlying the San Filippo exception to witness immunity vaporizes. Central to the Second Circuit's holding is that the conspiracy be one to give *false* testimony. See San Filippo, 737 F.2d at 255 (rationale for witness immunity-"to encourage witnesses to come forward with all they know-does not justify extending that immunity to cover extra-judicial conspiracies between witnesses and the prosecutor to give false testimony"). As such, a conspiracy to give false testimony has been referred to by the Second Circuit as one to give *perjurious* testimony, *see*, *e.g.*, Dory, 25 F.3d at 83, thus implying that the testimony be of a type for which perjury charges might attach.

Here, however, any underlying untruth of the offered statements would not give rise to a perjury charge against McKenna. By relaying information regarding Swiderski's statements in response to questioning, McKenna merely did what the law required of her. She had no personal knowledge from which to judge the underlying truth of Swiderski's statements and has never asserted otherwise. If the possibility of long and burdensome litigation were to generally attach whenever, as here, third-party statements might turn out to be false, witnesses would have good

reason to avoid ever giving such testimony, even when necessary.  This is clearly not the end that <u>San Filippo</u> seeks to serve.  At this point, though, the Court need not resolve the issue of whether a conspiracy claim against a party may ever be based on such statements because Blount's allegations of an actual conspiracy are speculative and unsubstantiated.

A plaintiff bringing a conspiracy claim "must show that the defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, to violate his rights."  <u>Berhanu v. N.Y. State Ins. Fund</u>, No. 91 Civ. 4956(BSJ), 1999 WL 813437, at *19 (S.D.N.Y. Oct. 8, 1999) (internal quotations and citations omitted).  Since a conspiracy is, by its very nature, a secret enterprise, <u>Grunewald v. United States</u>, 353 U.S. 391, 402, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), an agreement to conspire is difficult to directly prove, and may be inferred from circumstantial evidence.  <u>Cofacredit, S.A. v. Windsor Plumbing Supply Co.</u>, 187 F.3d 229, 240 (2d Cir. 1999); <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999).  This is not to say, however, that a plaintiff may overcome a summary judgment motion based simply on general and conclusory allegations.  <u>See</u> <u>Orange v. County of Suffolk</u>, 830 F. Supp. 701, 707 (S.D.N.Y. 1993); <u>see</u> <u>also</u> <u>Adler v. Pataki</u>, 204 F. Supp. 2d 384, 396 (N.D.N.Y. 2002)("innuendo, unrelated incidents and conclusory allegations, without any factual basis" insufficient to support conspiracy claim).

For the conspiracy here alleged to be even potentially viable under §§ 1983 or 1985, it would need to be shown by Blount that McKenna willfully entered into an agreement to give false testimony, and thus understood the falsity of Swiderski's account of events.  In essence, Blount is in the position of having to argue that Swiderski, in one meeting with McKenna,

admitted the falsity of the account he had maintained since the incident, but asked McKenna to tell anyone who might ask that his original untrue account remained his current account of events. And this is exactly what plaintiff argues, that Swiderski singled out McKenna, quickly learned that she shared his racist agenda, and decided that it would be safe to tell her the true story of January 6, 2000; this despite the fact that the two had never before met, despite the fact McKenna was Blount's former boss, and despite the record showing that Swiderski has never given a contrary account of events to any other witness. Of course, Blount offers no direct or circumstantial evidence to support this theory.

Furthermore, McKenna's role in the alleged conspiracy, if Blount's theory is to be believed, was to avoid giving any testimony that might rebut Swiderski's account of events, even though she had no personal knowledge from which to rebut his testimony. Fanciful as the existence of such a conspiracy is, McKenna's testimony cannot even support a finding that she carried out her alleged mission. In addition to testifying to Swiderski's account of events, McKenna also testified to Blount's account, which was relayed by phone call on the day of the incident. McKenna remembered Blount telling her that a court officer had put his arm around her and prevented her from entering into the courtroom. (McKenna WCB at 4.) This account is inconsistent with that of Swiderski, who has always maintained that he never touched or restrained Blount. If a conspiracy truly existed, McKenna would have perforce lied about this too, the most material of facts. <u>See</u> <u>Thomas v. Roach</u>, 165 F.3d 137, 146-47 (2d Cir. 1999) (affirming grant of summary judgment where district court had noted that "it would seem more conspiratorial if all of the defendants' stories matched up in the details"). While there are other

details of McKenna's testimony that may not completely coincide with Blount's account of their conversations, these inconsistencies are insignificant and insufficient to raise an inference of conspiracy.

In sum, Blount has presented no direct evidence of an actual conspiracy and her proffered circumstantial evidence – the defendants admitted encounter, and McKenna's testimony about Swiderski's statements – is woefully insufficient to overcome McKenna's summary judgment motion. Blount's allegations strain credulity beyond the breaking point. There are no genuine material facts in dispute to justify submitting this claim to a jury.

Summary judgment is similarly appropriate on Blount's conspiracy claim against Swiderski. Although Swiderski has not moved for summary judgment on this claim, Blount has had a full opportunity to put forth evidence of a conspiracy's existence in opposing the alleged co-conspirator's motion, and she has failed to do so. Without proof of any conspiracy at all, claims against both alleged co-conspirators must fall.

## CONCLUSION

For the foregoing reasons, the summary judgment motions of defendants Dave Janosek, Harold Butler, and Doreen McKenna are granted in full. The action is dismissed as to these defendants. Summary judgment is also granted for defendant Peter Swiderski on Blount's conspiracy claims. The remaining parties are directed to submit a joint pre-trial order by November 28, 2006. Trial of all remaining claims will commence on December 11, 2006.

**SO ORDERED.**

Dated: Brooklyn, New York
        November 14, 2006

                                        / s / Eric N. Vitaliano
                                        ERIC N. VITALIANO
                                        United States District Judge

37